**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**BRANCH and BETHEL, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 24, 2017**

# In the Court of Appeals of Georgia

A17A0849. AVERY et al. v. PAULDING COUNTY AIRPORT
    AUTHORITY et al.

A17A0877. AVERY et al. v. THOMPSON et al.

A17A1273. PAULDING COUNTY v. PAULDING COUNTY
    AIRPORT AUTHORITY.

A17A1274. SILVER COMET TERMINAL PARTNERS, LLC v.
    PAULDING COUNTY.

BRANCH, Judge.

This opinion concerns four appeals from three related declaratory judgment

actions arising out of the efforts of Paulding County and the Paulding County Airport

Authority ("PCAA") to apply for a commercial "Airport Operating Certificate" from

the Federal Aviation Administration ("FAA"). In April 2014, six Paulding County

taxpayers filed a declaratory judgment action asserting that while planning and

preparing to submit the FAA application, the PCAA repeatedly violated the Georgia

Open Meetings Act; in case No. A17A0877, the taxpayers appeal the trial court's decision to dismiss that suit as untimely and also appeal the denial of their own motion for summary judgment. In January 2016, the same taxpayers filed a second declaratory judgment action asserting that the person who submitted the application to the FAA was not authorized to do so by Paulding County and that, therefore, the application was ultra vires and void; in case No. A17A0849, the taxpayers appeal the trial court's dismissal of that action for failure to state a claim. Meanwhile in November 2015, Paulding County itself filed a declaratory judgment action against the PCAA seeking a declaration that the PCAA could not move forward with the application without the county's consent; in case No. A17A1273, the county appeals the trial court's dismissal of that action. And, in case No. A17A1274, a third party that had intervened in the county's action appeals the dismissal of its counterclaims against the county.

All four appeals arise from a dismissal by the trial court for failure to state a claim.[1] A complaint should be dismissed for failure to state a claim only if:

---

[1] Although one action was dismissed based on a statute of limitations, that, too is a failure to state a claim. See *Towe v. Connors*, 284 Ga. App. 320, 321 (644 SE2d 176) (2007) (dismissal based on affirmative defense of statute of limitation "is in essence dismissal for failure to state a claim upon which relief can be granted") (citation omitted).

> (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought.

*Stendahl v. Cobb County*, 284 Ga. 525 (1) (668 SE2d 723) (2008) (citation omitted). In answering this question, "an appellate court must construe the pleadings in the light most favorable to the appellant with all doubts resolved in the appellant's favor." *Thomas v. Lee*, 286 Ga. 860, 861 (691 SE2d 845) (2010). Appellate review of the trial court's decision is de novo. *Northway v. Allen*, 291 Ga. 227, 229 (728 SE2d 624) (2012).

The facts recited herein are taken from the pleadings[2] in all three declaratory judgment actions. When analyzing the propriety of the dismissal in each action, however, we will only consider the facts as alleged in the relevant action.

---

[2] Although there are depositions, affidavits and other documents in the records, there is no indication that the trial court converted any motion to dismiss into a motion for summary judgment and considered that evidence. We therefore limit our review, as dictated by the standard of review for a motion to dismiss, to the pleadings.

3

At some point prior to 2012, a general aviation airport[3] was built on two tracts of land, one owned by Paulding County and the other owned by the PCAA. At that time, the county operated the airport through its "Airport Department." With regard to that airport, the county, but not the PCAA, participated in a federal program known as the Airport Improvement Program ("AIP") that provides grants to public agencies for the planning and development of airports. As a part of that program, Paulding County was required to comply with certain conditions and obligations known as "grant assurances"[4] with respect to the airport. Thus, Paulding County was the airport's sole "sponsor" for the purpose of the grant assurances.[5]

---

[3] A "'general aviation airport' means a public airport that is located in a State and that, as determined by the Secretary--(A) does not have scheduled service; or (B) has scheduled service with less than 2,500 passenger boardings each year." 49 U.S.C. § 47102 (8).

[4] Under the AIP, "Congress provided that the FAA may approve a grant application for an airport development project only if the FAA, among other things, receives written assurances (grant assurances) that the airport will be available for public use on reasonable conditions and without unjust discrimination. Grant assurances are contractual obligations that remain in effect throughout the useful life of the facilities funded with grant money, which is not to exceed 20 years." Aimee Kratovil, The Airport Noise and Capacity Act of 1990: Superfluous Hurdle for Airport Proprietors Who Have Assured Federal Grants, 12 Penn St. Envtl. L. Rev. 499, 515-516 (2004) (footnotes omitted); see also 49 USCA § 47107.

[5] See 49 USCA § 47102 (26) ("'sponsor' means--(A) a public agency that submits to the Secretary under this subchapter an application for financial assistance").

4

Between November 21, 2012, and September 13, 2013, the PCAA[6] held a series of meetings regarding the airport that did not comply with the Georgia Open Meetings Act. In November 2012, at one of these meetings, the PCAA approved and, along with the Paulding County Industrial Building Authority (the "IBA"), later entered into a "Commercial Lease and Airport Use Agreement" with Silver Comet Terminal Partners, LLC, a private entity. Among other things, the lease provided that Silver Comet, in anticipation of commercial passenger service, could "require the PCAA to apply for [an] Airport Operating Certification . . . with the [FAA] . . . at [the PCAA's] sole cost and expense."

On or about September 24, 2013, Blake Swafford signed and submitted to the FAA a joint "Application for Certificate," also known as a Part 139 application, purportedly on behalf of both the county and the PCAA, seeking a Class I airport operating certificate that would allow the airport to handle, among other things, "scheduled operations of large air carrier aircraft." See 14 CFR § 139.5. As alleged by the taxpayers, if granted, the operating certificate would "obligate the County in numerous respects to the funding and operation of a commercial airport; . . . require

---

[6] The PCAA was created by the legislature in 1972 as a "political subdivision of the State of Georgia and a public corporation." Ga. L. 1972, p. 3645, § 2.

certain types of work to be done to County property; and . . . require the determination of the priority of capital improvements, which would be funded in whole or in part by the County."

Although Swafford later became the "Airport Director" of the PCAA, he was not an officer or employee of the PCAA at the time that he signed the application; rather, he was employed by the county as the Director of the Airport Department. In the one-page Part 139 application, Swafford averred that the airport was owned by both the county and the PCAA, and he signed the application, listing his title as "Director," without indicating the entity for which he worked or for which he was signing. But Paulding County never formally authorized the PCAA or Swafford to act on the county's behalf to pursue or file the Part 139 application. As the PCAA admits, only the Paulding County Board of Commissioners ("BOC") could authorize submission of the Part 139 application on behalf of Paulding County, yet the BOC never discussed or approved submission of a Part 139 application at a public meeting or voted to authorize the PCAA or any representative thereof to submit the Part 139 application on the BOC's behalf.

In October 2013, the PCAA issued revenue bonds to expand taxiways at the airport, and the county contracted with the PCAA to make payments to the PCAA

6

sufficient to allow the PCAA to make payments on the bonds. Silver Comet also agreed to make a $500,000 payment to an escrow account to be used in support of the payments on the bonds.

In October 2014, Paulding County and the PCAA entered into a ten-year "Intergovernmental Contract" (the "IGA") related to the operation of the airport. Under the IGA, the PCAA agreed to operate and maintain the airport for a period of ten years and to report annually to the county as to expenditures. In exchange, the county agreed, among other things, to eliminate the staffing of its own Airport Department; to make certain payments to the PCAA over the ten-year term of the IGA (from the county's general fund or from the proceeds of a property tax levied for this purpose); and to transfer approximately 168 acres of property to the PCAA.[7] The IGA, however, does not indicate that it is dependent on the grant of an airport operating certificate by the FAA; in fact the agreement states that "[n]o approval or other action by any governmental authority or agency or other person is required in connection with the execution, delivery and performance of this Contract by the [PCAA or the county], except as shall have been obtained as of the date hereof." The

_____

[7] There is no allegation in the pleadings that the subject property has been transferred to the PCAA.

7

agreement references "a Part 139 Certification" on only one occasion: the IGA provides that the county was required to fund police and fire protection at the airport, "including, but not limited to services required or in conjunction with a Part 139 Certification." Finally, the IGA provides that the county would remain as the sponsor under the AIP grant program for the term of the IGA:

> [T]he County shall remain as the Sponsor for current and future Airport Improvement Program (AIP) grants administered by the [FAA] and further agrees to take no action that is inconsistant with receiving or negatively affects such grants or any other federal or state grants to which the County or the Authority are eligible to receive in conjunction with the Airport.

And, in an amendment to the IGA, the parties made clear that "this Contract is subordinate to those requirements under federal law or regulations pertaining to [AIP] grants, including specifically but without limitation, federal obligations of airport sponsors commmonly referred to as [AIP] Grant Assurances." After entering into the IGA, the county eliminated the staffing of its Airport Department, and Blake Swafford changed employment from the county to the PCAA.

On January 13, 2015, however, while the Part 139 application was still pending with the FAA, and apparently as a result of a change in the composition of the

8

Paulding County BOC, the BOC approved Resolution 15-01, which provides as follows:

> NOW, THEREFORE, be it resolved by the [BOC] as an Airport sponsor that the application to the FAA for a Part 139 Certificate is hereby withdrawn and any associated environmental review is hereby terminated. . . . Accordingly, the [BOC] hereby directs the Clerk to transmit immediately this Resolution to the FAA.

The BOC then submitted a copy of the resolution to the FAA. The PCAA also submitted a letter to the FAA requesting that notwithstanding the withdrawal of the county's support, the FAA should continue to consider the Part 139 application, because the application "was submitted by the Airport Director, *not by the Paulding County Commission*[,] . . . follow[ing] a vote of the [PCAA]." (Emphasis supplied). In a letter dated June 30, 2015, the FAA wrote to the BOC and stated the following:

> Because Part 139 requires that, "no person *may operate an airport* specified under § 139.1 of this part without an Airport Operating Certificate," 14 C.F.R. § 139.101(a) (emphasis added), Part 139 applies to airport operators. The October 2014 [IGA] executed between the County and the [PCAA] appears to make the [PCAA] responsible for operating [the airport]. As you are aware, the [PCAA] has expressed interest in introducing commercial service to [the airport] notwithstanding the County's [Resolution 15-01]. In light of the IGA

9

and Part 139's strictures on airport operators, the FAA is inclined to deem the Part 139 application to remain active and pending."

(Emphasis in original). The letter also asked the BOC to answer questions regarding on whose behalf the Part 139 application was submitted, the legal effect of Resolution 15-01, whether the county sought to withdraw the application in its entirety or only to withdraw the county as a party to the application, and what legal authority the county had to withdraw the application given that the IGA allowed the PCAA to operate the airport. There is no allegation that the BOC has responded to the FAA's questions. The parties agree that the FAA has indicated that it is waiting for a resolution of all related cases before issuing a decision on the Part 139 application.[8]

Meanwhile, in April 2014, six Paulding County taxpayers filed a declaratory judgment action against the PCAA and ten members of the PCAA, including Swafford, each individually and in their official capacity (collectively, "the defendants" or "the PCAA"), asserting that while planning changes for the airport, the PCAA repeatedly violated the Georgia Open Meetings Act ("OMA"), (the "OMA

---

[8] See also 81 Fed. Reg. 36144-01 (IV) ("The FAA expects that all disputes about whether to change airport sponsorship and/or operating authority will be resolved through a legally-binding agreement between the parties involved in the dispute or a final, non-reviewable legal decision.").

action"). In that action, the taxpayers demanded three forms of relief: a declaration that the PCAA had violated OMA; an injunction prohibiting the PCAA from violating OMA in the future; and civil penalties of $1,000 on each defendant for their violations of OMA. The taxpayers specifically pled that they "[did] not seek to invalidate any resolution, rule, regulation, ordinance or other official action taken at the meeting on June 18-19, 2013." The taxpayers later moved for summary judgment on the ground that it was undisputed that the PCAA violated OMA. At the hearing on the motion for summary judgment, the PCAA moved to dismiss the OMA action as untimely.

In January 2016, the same six taxpayers filed a second action against the same defendants asserting that neither Swafford nor the PCAA was authorized to submit the Part 139 application to the FAA on behalf of Paulding County and that, therefore, the application was ultra vires and void and should be declared so (the "Voidness action"). The defendants moved to dismiss for failure to state a claim on the grounds that the taxpayers lacked standing to bring the declaratory judgment action, that the case was not ripe for review because there was no controversy and the taxpayers were not in a position of uncertainty, and that the defendants received insufficient service of process.

11

Finally, in July 2016, Paulding County filed a declaratory judgment action against the PCAA (but not the individuals) alleging that the county does not support commercialization of the airport or the FAA's continued review of the Part 139 application and that it has withdrawn any prior support for the application (the "County action"). The county contends that

> (i) it is the owner of the Airport; (ii) it retains the final decision-making authority on whether to seek a change in the scope of aviation services offered at the Airport; (iii) the PCAA is merely providing services to Paulding County under the IGA relating to the operation and maintenance of the Airport in its current condition; (iv) Paulding County withdrew its support for the Part 139 Application through the passage of Resolution 15-01; and (v) the PCAA lacks the authority to seek an Airport Operating Certificate . . . without the approval and support of Paulding County.

In addition to injunctive relief and expenses of litigation, the county requested that the court declare that the PCAA lacks the authority to submit the Part 139 application to the FAA seeking to change the nature and scope of services offered at the airport without the county's consent and approval, which has been withdrawn. In response to the county's complaint, the PCAA moved to dismiss for failure to state a claim on

12

the grounds that there was no case or controversy and that the trial court lacked jurisdiction to provide declaratory relief.

Silver Comet successfully intervened in the County action and filed a counterclaim against Paulding County seeking a declaratory judgment and asserting a claim under 42 USC § 1983, alleging that the county's actions violate the Contracts Clause of both the United States Constitution and the Constitution of the State of Georgia. Paulding County moved to dismiss the counterclaims.[9]

The trial court held hearings in May and August 2016 on the motions in the two taxpayer cases, respectively, and a hearing on the motions in the County action in October 2016. On October 31, 2016, the court issued rulings in all three cases. The court denied the taxpayers' motion for summary judgment in the OMA action and granted the defendants' motion to dismiss on the ground that the taxpayers' claims were time barred by OCGA § 50-14-1. The trial court also granted the defendants' motion to dismiss the taxpayers' Voidness action without explanation. The taxpayers appeal both rulings. Finally, the court granted the PCAA's motion to dismiss the

---

[9] Paulding County also amended its complaint to add a claim for breach of contract against Silver Comet arising out of Silver Comet's failure to make the $500,000 payment to an escrow account; the county claims that it is authorized to exercise PCAA's rights under the related agreement. The county's breach of contract claim against Silver Comet remains pending below and is not before us.

County action without explanation, and, shortly thereafter, granted the county's motion to dismiss Silver Comet's counterclaims. The county appeals the dismissal of its action, and Silver Comet appeals the dismissal of its counterclaims.

*A17A0877*

1. In the OMA action, the taxpayers contend the trial court erred by holding that OCGA § 50-14-1 bars their claims for declaratory and injunctive relief and civil penalties. They also contend the trial court erred by denying their motion for summary judgment. For the reasons below, we hold that the taxpayers' claims are not time barred but that the taxpayers are not entitled to summary judgment on their OMA claims.

Our review requires construction of certain provisions of OMA. When construing a statute, "we must presume that the General Assembly meant what it said and said what it meant." *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (citation and punctuation omitted). Thus if the language of the statute "is plain and unambiguous, judicial construction is not only unnecessary but forbidden." *Six Flags Over Ga. II v. Kull*, 276 Ga. 210, 211 (576 SE2d 880) (2003) (citation omitted). Where terms of art are not involved, we look to the common and customary usages

14

of the words and their context. *Zaldivar v. Prickett*, 297 Ga. 589, 591 (1) (774 SE2d 688) (2015).

(a) OMA provides, among other things, that public agency[10] "[m]eetings" shall be "open to the public," OCGA § 50-14-1 (a) (1), (b) (1), and it provides several remedies for failure to comply with the act. The primary remedy is that official actions taken at meetings that violate OMA are not binding:

> Any resolution, rule, regulation, ordinance, or other official action of an agency adopted, taken, or made at a meeting which is not open to the public as required by this chapter shall not be binding.

OCGA § 50-14-1 (b) (2). The same subsection of OMA provides a statute of limitation for any civil action "contesting" a public-agency action that fails to comply with OMA:

> Any action *contesting* a resolution, rule, regulation, ordinance, or other formal action of an agency based on an alleged violation of this provision shall be commenced within 90 days of the date such contested action was taken or, if the meeting was held in a manner not permitted by law, within 90 days from the date the party alleging the violation knew or should have known about the alleged violation so long as such

---

[10] The parties do not dispute that OMA applies to the PCAA.

15

date is not more than six months after the date the contested action was taken.

Id. (emphasis supplied).

In a separate Code section of the act, OMA gives superior courts "jurisdiction to enforce compliance" with OMA, "including the power to grant injunctions or other equitable relief." OCGA § 50-14-5 (a). Courts may also award attorney fees and costs incurred in an action "to enforce" the provisions of OMA if the defendant agency acted without substantial justification in its noncompliance:

> In any action brought to enforce the provisions of this chapter in which the court determines that an agency acted without substantial justification in not complying with this chapter, the court shall, unless it finds that special circumstances exist, assess in favor of the complaining party reasonable attorney's fees and other litigation costs reasonably incurred.

OCGA § 50-14-5 (b). Finally, OMA provides criminal and civil penalties for persons who "knowingly and willfully," or "negligently," violate OMA's terms. OCGA § 50-14-6.

The taxpayers contend that the limitation period found in OCGA § 50-14-1 (b) (2) pertains only to civil actions that seek to invalidate public agency actions that fail

16

to comply with OMA, which remedy they expressly did not seek; they argue that the same limitation period does not apply to actions, such as theirs, that seek only declaratory relief, injunctive relief, attorney fees, and civil penalties.[11] The PCAA contends that OCGA § 50-14-1 (b) (2), the only limitation period found in OMA, pertains to any civil action arising out of OMA. Based on the plain language of the statute, we agree with the taxpayers.

As shown above, OMA's limitation period pertains to "[a]ny action *contesting* a resolution, rule, regulation, ordinance, or other formal action of an agency based on an alleged violation [of OMA]." The transitive verb "contest" had been defined as "to make the subject of dispute, contention, or litigation; especially: dispute, challenge"[12]; "to argue against; dispute"[13]; and "[to o]ppose (an action or theory) as mistaken or

---

[11] Because this case does not involve criminal penalties, we need not consider or decide whether the limitation period found in OCGA § 50-14-1 (b) (2) applies to the criminal penalties found in OCGA § 50-14-6.

[12] "Contest." Merriam-Webster.com. Merriam-Webster, www.merriam-webster.com/dictionary/contest. Accessed: August 2017.

[13] "Contest." Dictionary.com, Unabridged. Random House, Inc. http://www.dictionary.com/browse/contest. Accessed: August 2017.

wrong. . . [to e]ngage in dispute about."[14] The direct object of "contest" as used in OCGA § 50-14-1 (b) (2), is any "resolution, rule, regulation, ordinance, or other formal action of an agency" that was made at a meeting that violated OMA; the direct object of "contest" is not the OMA violation itself. Thus, based on a plain reading of OMA, the limitation period found in OCGA § 50-14-1 (b) (2) applies only to civil actions that contest a public agency decision.

In the OMA action, the taxpayers do not challenge or contest the PCAA's decision to file a Part 139 application. They specifically pled that they "[did] not seek to invalidate any resolution, rule, regulation, ordinance or other official action taken at the meeting on June 18-19, 2013." Rather they seek a declaration that the PCAA violated OMA requirements, as well as an injunction prohibiting the PCAA from violating OMA in the future and civil penalties of $1,000 on each defendant for their violations of the OMA. Thus, in the OMA action the taxpayers seek only remedies related to OMA violations themselves; they do not challenge a PCAA formal action. Accordingly, the limitation period found in OCGA § 50-14-1 (b) (2) is inapplicable to the OMA action. Thus, the trial court erred by dismissing the OMA action as

---

[14] "Contest." OxfordDictionaries.com, American English. Oxford Dictionaries, https://en.oxforddictionaries.com/definition/us/contest. Accessed August 2017.

untimely under OCGA § 50-14-1 (b) (2). The question of what limitation period does apply to the taxpayers' OMA claims in lieu of OCGA § 50-14-1 (b) (2) is not before us.

(b) The taxpayers also appeal the denial of their motion for summary judgment in the OMA action. A party is entitled to summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). "On appeal from the grant of summary judgment, we construe the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible inferences. The party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact." *Ansley v. Raczka–Long*, 293 Ga. 138, 140 (2) (744 SE2d 55) (2013) (citations omitted); see also *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003). Our review is de novo. See *Ansley*, 293 Ga. at 140 (2).

In their motion for summary judgment, the taxpayers argued that it was undisputed that the PCAA and the individual defendants were subject to and repeatedly violated OMA; they also argued that the defendants violated OMA willfully "as part of a calculated effort to conceal from the citizens their plans to

convert the Airport into a commercial aviation facility." The taxpayers therefore requested that the court provide the three remedies listed above. The defendants argued below that, among other things, the trial court should decline to grant injunctive relief or impose monetary penalties because the actions complained of were remedied immediately by the PCAA. On appeal, the taxpayers contend they were entitled to summary judgment on these claims. Even assuming that it is undisputed that the defendants violated OMA, we disagree with the taxpayers.

First, declaratory relief is not appropriate. Such relief is available "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." OCGA § 9-4-1; see also *Walker v. Owens*, 298 Ga. 516, 518 (783 SE2d 114) (2016) ("[T]he object of the declaratory judgment is to permit determination of a controversy before obligations are repudiated or rights are violated.") (citations omitted). In fact,

> [w]here the party seeking declaratory judgment does not show it is in a position of uncertainty as to an alleged right, dismissal of the declaratory judgment action is proper; otherwise, the trial court will be issuing an advisory opinion, and the Declaratory Judgment Act makes no provision for a judgment that would be "advisory."

20

*Baker v. City of Marietta*, 271 Ga. 210, 214 (1) (518 SE2d 879) (1999) (citations omitted). In the OMA action, as they admit, the taxpayers do not seek to contest any decisions made at any of the challenged meetings or assert that they are in a position of uncertainty as to an alleged right. Rather they seek to prohibit future violations of OMA and to punish the PCAA and the individual defendants after the fact for violating OMA. Thus, the taxpayers have failed to allege that they are in any position of uncertainty. "Nor was there any evidence that [the taxpayers] were in danger of repudiating any of [their] obligations or suffering a violation of [their] rights in the absence of a declaratory judgment." See *Loyd v. City of Irwinton*, 142 Ga. App. 626, 626 (1) (236 SE2d 889) (1977). Accordingly, the trial court did not err by denying the taxpayers' motion for summary judgment on this claim.

As for the taxpayers' claim for future injunctive relief, "[t]he granting and continuing of injunctions shall always rest in the sound discretion of the judge, according to the circumstances of each case." OCGA § 9-5-8. "Because of this strict language and the broad discretion accorded trial courts, we are loath[] to compel a trial court to enter a permanent injunction, even when the trial court finds facts that support the granting of an injunction." *Bishop Eddie Long Ministries v. Dillard*, 272 Ga. App. 894, 900-901 (2) (613 SE2d 673) (2005) (citation omitted). Thus, here,

where the trial court dismissed the taxpayers' claims as untimely and therefore did not address the taxpayers' claim for injunctive relief, we find no basis to reverse the denial of summary judgment on this ground.

As for the taxpayers' request that the court impose monetary penalties on the defendants for negligent violations of OMA, OCGA § 50-14-6 provides that the trial court "may" impose civil penalties against those who violate OMA. And the defendants argued that penalties were not appropriate under the circumstances. Thus, again, we find no basis to reverse the denial of summary judgment on this ground.

In sum, we reverse the trial court's dismissal of the OMA action but affirm the denial of the taxpayers' motion for summary judgment.

### *A17A0849*

2. In Case No. A17A0849, the taxpayers contend the trial court erred by granting the defendants' motion to dismiss the Voidness action. In the Voidness action, the taxpayers asserted that neither Swafford nor the PCAA was authorized to submit the Part 139 application to the FAA on behalf of Paulding County and that, therefore, the application was ultra vires and void. The defendants moved to dismiss on three grounds: (1) that the taxpayers lacked standing "because no ultra vires act was committed by any Defendants"; (2) that the case was not ripe for review because

there was no controversy or uncertainty; , and (3) that the defendants received insufficient service of process.[15] The trial court granted the motion without explanation. On appeal, the taxpayers argue that they have standing to sue, that the trial court failed to apply the proper standard on a motion to dismiss, that declaratory relief is appropriate, and that therefore the trial court erred by dismissing the Voidness action. Again, with regard to the facts, we must accept all well-pled allegations in the Voidness action complaint as true and resolve doubts in favor of the taxpayers. *Thomas*, 286 Ga. at 861.

Pretermitting whether the taxpayers have standing, we hold that they have not alleged a proper case or controversy under the Declaratory Judgment Act and that the trial court therefore properly dismissed the Voidness action. That act gives superior courts, "[i]n cases of actual controversy," the power "to declare rights and other legal relations of any interested party petitioning for such declaration[.]" OCGA § 9-4-2 (a). The purpose of the act "is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." OCGA § 9-4-1. Our Supreme Court has defined "actual controversy" as "a justiciable controversy where there are interested parties asserting adverse claims on an accrued set of facts."

---

[15] This final argument has not been reasserted on appeal.

*Leitch v. Fleming*, 291 Ga. 669, 670 (1) (732 SE2d 401) (2012) (citation and punctuation omitted). "For a controversy to justify the making of a declaration, it must include a right claimed by one party and denied by the other, . . ." Id. (citation omitted). Moreover, "declaratory relief is proper only where the party seeking such relief faces some uncertainty or insecurity as to rights, status, or legal relations, upon which its future conduct depends." *SJN Properties v. Fulton County Bd. of Assessors*, 296 Ga. 793, 802-803 (2) (b) (iii) (770 SE2d 832) (2015).

In *Henderson v. Alverson*, 217 Ga. 541 (123 SE2d 721) (1962), the plaintiff sought declaratory relief as "a citizen, a taxpayer, a resident and duly qualified voter in Fulton County." He sought a declaration that a constitutional amendment was void because it had been improperly adopted and because it was contrary to the United States Constitution. Id. at 541. The Supreme Court of Georgia upheld the defendants' demurrers and held that declaratory relief was inappropriate because the plaintiff had failed to allege that he faced some uncertainty or insecurity as to his rights, status, or legal relations, upon which his future conduct depended:

> The plaintiff alleged no deprivation of a personal right or any other interest apart from that of a member of the general public. No facts or circumstances were alleged to show any necessity for a determination of any dispute to guide and protect the plaintiff from uncertainty and

24

insecurity with regard to the propriety of some future act or conduct which is properly incident to his alleged rights and which future action, without such directions, might reasonably jeopardize his interest.

Id. (citation omitted). The same is true here. The taxpayers only assert that as "citizens of Georgia and residents and taxpayers of Paulding County," they seek to declare void an ultra vires act of the county. The taxpayers do not allege any uncertainty or insecurity as to their rights, status, or legal relations. Although they argued at the motions hearing below that they lived in close proximity to the airport and were directly and adversely affected by commercialization, their complaint makes no such allegation, either express or implied, either in their allegations or in their requested relief. Thus there is nothing within the framework of the complaint to that effect. See *Roberts v. JP Morgan Chase Bank, Nat. Assoc.*, 342 Ga. App. 73, 76 (802 SE2d 880) (2017) (a complaint is sufficient "if, within the framework of the complaint, evidence may be introduced which will sustain a grant of relief to the plaintiff") (citation and punctuation omitted). Accordingly, the taxpayers failed to state a claim in the Voidness action, and the trial court did not err by dismissing their complaint in that action. See *Baker*, 271 Ga. at 214 (1) ("[w]here the party seeking declaratory judgment does not show it is in a position of uncertainty as to an alleged

25

right, dismissal of the declaratory judgment action is proper"); *Center for a Sustainable Coast v. Ga. Dept. of Natural Resources*, 319 Ga. App. 205, 208 (1) (734 SE2d 206) (2012), rev'd on other grounds, 294 Ga. 593 (755 SE2d 184) (2014) (dismissal of declaratory judgment action proper where plaintiff was "not seeking guidance with respect to actions it might take. Rather, it seeks a declaration that past actions taken by the Respondents were ultra vires."); *Henderson*, 217 Ga. at 541; see also *SJN Properties*, 296 Ga. at 802-803 (2) (b) (iii) (summary judgment proper on claim for declaratory relief where claimant failed to show that it faced any uncertainty or insecurity as to any of its own future conduct).

### *A17A1273*

3. In A17A1273, the county appeals the dismissal of its declaratory judgment action against the PCAA. In that action, Paulding County requested that the court declare "that the PCAA lacks the authority to submit an application to the FAA for an Airport Operating Certificate under 14 C.F.R. 139 et seq. seeking to change the nature and scope of services offered at the [current] Airport."[16]

The county alleged that the case involves the following controversy:

---

[16] The county also sought to enjoin the PCAA from proceeding further with the Part 139 application while the case was pending, as well as litigation expenses and fees.

26

whether the PCAA is authorized — by virtue of the IGA, the Lease, or otherwise — to seek a change in the nature and scope of services offered at the Airport and to submit an application to the FAA for the Airport Operating Certificate under 14 C.F.R. 139 et seq. in an effort to commercialize the Airport.

The county further alleged that the PCAA is not authorized to do so "without the approval and support of Paulding County" and that the county withdrew its consent in Resolution 15-01. As more succinctly stated in a brief, "what Paulding County seeks is a discrete declaration that the PCAA lacks the authority to submit and pursue a Part 139 Application for this specific Airport, without Paulding County's consent."[17]

The PCAA countered that the dispute between the county and the PCAA was a policy dispute, not a legal controversy, because the plain language of the PCAA enabling statute authorized the PCAA to file a Part 139 application independent of the county. The PCAA argued that through the IGA, Paulding County empowered the PCAA to operate and maintain the airport. The PCAA also argued that the trial court

---

[17] The county, unlike the taxpayers, does not argue that the Part 139 application was ultra vires and void. Because the county has now withdrawn its consent to the pending Part 139 application, the issue of whether the Part 139 application was ultra vires and void appears to be moot.

27

did not have the authority to order the FAA to cease considering the Part 139 application. The trial court dismissed the action without explanation. For the following reasons, we hold that the county has properly alleged a case or controversy under the Declaratory Judgment Act and that therefore the county's case should not have been dismissed.

As in the Voidness action, the question is whether the county has sufficiently alleged, for the purposes of a motion to dismiss, an actual justiciable controversy, i.e., one "where there are interested parties asserting adverse claims on an accrued set of facts." *Leitch*, 291 Ga. at 670 (1) (citation and punctuation omitted). Here, construing the complaint and its exhibits[18] in favor of the county, the county has alleged that it was the original operator of the general aviation airport; that as a part of operating that airport, the county was required to comply with certain federal grant assurances; that under the IGA, which is not contingent on the Part 139 application, the PCAA agreed to operate and maintain the airport for a period of only ten years; that the county was not a party and did not formally approve the agreement between the

---

[18] Courts are authorized to consider documents attached to a complaint when ruling on a motion to dismiss, without converting the motion into one for summary judgment. See OCGA § 9-11-10 (c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Lord v. Lowe*, 318 Ga. App. 222, 223 (741 SE2d 155) (2012).

28

PCAA and Silver Comet that authorized Silver Comet to require the PCAA to file a Part 139 application; that the county did not vote in a public meeting to approve submission of the Part 139 application; that the application pending before the FAA purports to be a joint[19] application between the PCAA and the county to convert the current general aviation airport into a commercial airport; that the county owns a portion of the property upon which the airport is located; that the grant of an operating certificate would increase the county's obligations under the federal grant assurances; that the county later resolved to withdraw the Part 139 application purportedly filed on its behalf; that the county notified the FAA of the withdrawal but the FAA considers the application still pending and is awaiting a final resolution of the various actions before acting on the application; and that the PCAA claims that it is entitled to move forward with the current joint Part 139 application without the county's consent even though the county owns a portion of the land that comprises the airport. Thus, the PCAA claims a right that is denied by the county — to pursue the joint Part 139 application without the county's consent. It follows that the

---

[19] See OCGA § 6-3-20 (a) (The legislature has empowered counties, municipalities, and other political subdivisions, "separately *or jointly*, to acquire, establish, construct, expand, own, lease, control, equip, improve, maintain, operate, regulate, and police airports.") (emphasis supplied).

29

allegations sufficiently allege an actual controversy for which declaratory relief is appropriate. See, e.g., *Upper Oconee Basin Water Auth. v. Jackson County*, 305 Ga. App. 409, 414 (2) (a) (699 SE2d 605) (2010) (county stated a claim for declaratory relief against water authority where county alleged uncertainty as to its future rights to use a reservoir under an intergovernmental agreement).

The PCAA counters that under the legislative act that created the PCAA, Ga. L. 1972, p. 3645, it is fully authorized to own and operate airports on its own, including entering into contracts with the federal government as necessary. It also argues that under the IGA, it was fully authorized by the county to proceed as it sees fit to operate the airport. Although those assertions may be true, they do not address the issue at hand, which is whether the PCAA may continue to seek an airport operating certificate under a joint application with the county when the county, a part owner of the land at issue, was the original operator of the general aviation airport and is bound by certain grant assurances in connection with that airport, but has now withdrawn its consent to the joint application. Neither the act that created the PCAA nor the IGA contains a provision addressing this situation. At this point in the development of the facts of the case, the county has alleged that it will be harmed by

the grant of a commercial operating certificate because of its present obligations tied to the general aviation airport, a portion of which it allegedly still owns.[20]

It may be that development of the facts could show that the county's position is unsupportable for a number of reasons, and a motion for summary judgment may become appropriate. At this preliminary stage of the litigation, however, we conclude that the trial court erred by granting the PCAA's motion to dismiss the County action.

### A17A1274

In Case No A17A1274, Silver Comet appeals the dismissal of its counterclaim in the County action. Silver Comet avers many of the same facts set forth above. In addition, construed in favor of Silver Comet, the allegations of the counterclaim show the following:

Representatives of the county and the PCAA had conversations about and entered into a plan to develop the airport into a commercial airport, and they knew and understood that a Part 139 airport operating certificate would be necessary to

---

[20] Although it has been asserted in a brief that the county has now transferred to the PCAA the remaining land upon which the airport is located, that allegation is not in the pleadings, which we must construe in favor of the county, and was not before the trial court at the time of its order. See *City of Atlanta v. Atlanta Independent School System*, 300 Ga. 213, 217, n. 4 (794 SE2d 162) (2016) (evidence not available to the trial court at the time it considered the viability of a declaratory judgment action would not be considered on appeal).

carry out the plan. Paulding County also knew and agreed that a private operator, ultimately Silver Comet, would be solely responsible for the commercial aviation and related development at the airport. Accordingly the parties worked toward these goals and spent money doing so, culminating in the Part 139 application and a public announcement by the county and Silver Comet that they had entered into an agreement to develop commercial passenger service at the airport.

Meanwhile, Silver Comet, the PCAA, and the IBA had entered into the November 2012 lease and airport use agreement, of which Paulding County was aware at the time. That agreement gave Silver Comet "the right. . . to require" the PCAA to submit a Part 139 application and to use best efforts to obtain the certification necessary for commercial passenger service at the airport. Silver Comet would not have entered into the agreement absent that provision.

After submission of the Part 139 application, the county acted consistently with the effort to commercialize the airport, including by entering into an agreement regarding the issuance of bonds by the PCAA, secured by the county, to finance improvements to the airport. The county even defended the bond issuance in court, including in an appeal to the Georgia Supreme Court. See *Avery v. State of Ga.*, 295 Ga. 630 (761 SE2d 56) (2014). Silver Comet also entered into an agreement to pay

32

to the PCAA an amount equal to the PCAA's bond payments, and it made those payments in 2014. Also in 2014, the county, as the airport sponsor under federal law, allegedly asked the FAA to add the PCAA as a co-sponsor of the airport for the purposes of receiving AIP grants; the county also submitted a request for additional grants under the AIP program for costs associated with improving the airport for commercial service. The county also entered into the IGA with the PCAA, under which the county agreed to remain the airport sponsor "for current and future" AIP grants and agreed not to take any actions "inconsistent with receiving or negatively affect[ing] such grants."

Silver Comet also alleged that Paulding County, as the airport sponsor, breached the IGA by withdrawing its support for the Part 139 application. Silver Comet alleged that the county breached representations and warranties in the IGA to the effect that it had the authority to enter into the IGA and bond-related agreements. Silver Comet alleges that it reasonably relied on those representations and invested "millions of dollars" into the development of commercial passenger service at the airport. Further, Silver Comet alleges that the county's actions seek to prevent the PCAA and Silver Comet from carrying out, and have impaired, their contractual

33

obligations in connection with the airport and have caused Silver Comet economic harm.

Accordingly, Silver Comet alleges that it is uncertain of its rights and obligations under its own agreements as a result of the county's change of heart. It therefore sought a declaration

> that the FAA is the exclusive authority for determining who may seek and obtain a Part 139 Certificate, who may withdraw a Part 139 Application, [and] what is necessary in order to grant a Part 139 Application[.]

Silver Comet also sought a declaration "that the Part 139 Certificate . . . be issued to the [PCAA] without further delay." Finally, Silver Comet sought damages under 42 USC § 1983, claiming that the county impaired Silver Comet's contractual rights in violation of the United States Constitution and the Constitution of the State of Georgia. Based on the above allegations, Silver Comet contends the trial court erred by dismissing its counterclaims. We disagree.

(a) Silver Comet has not pled a case or controversy sufficient to support a declaratory judgment action. First, Silver Comet is not a party to the "actual case or controversy" raised by the county in the County action, that is, whether the PCAA may proceed with the Part 139 application without the county's consent. Silver Comet

34

does not claim a right to proceed with the Part 139 application in its own name, as does the PCAA. The only related right that Silver Comet claims is one that it has already exercised, that of requiring that the PCAA to submit the Part 139 application, which there is no guarantee that the FAA will grant. Although Silver Comet alleges that it reasonably relied on the county to continue its support for the commercialization of the airport, it has not alleged that it was a party to or a third-party beneficiary of any contracts with the county. In short, we fail to see a right claimed by Silver Comet that was denied by the county. See *Leitch*, 291 Ga. at 670 (1). Finally, the FAA is not a party to the County action and the FAA's authority is not an issue in the case. Thus the first declaration that Silver Comet seeks — concerning the powers of the FAA — quite simply does not include "a right claimed by one party and denied by the other." Id. The trial court therefore did not err by dismissing Silver Comet's claim for a declaratory judgment. See *Airport Auth. of City of St. Marys v. City of St. Marys*, 297 Ga. App. 645, 648 (678 SE2d 103) (2009) (declaratory judgment action properly dismissed where plaintiff was frustrated with city's actions and the possible effect on the plaintiff's plans but where plaintiff failed to demonstrate uncertainty and insecurity arising out of a right it held by law or contract).

(b) Silver Comet contends the trial court erred by dismissing its claim for damages under 42 USC § 1983[21] for alleged violations of the Contracts Clause of the Georgia and federal constitutions. We disagree.

"[Section] 1983 . . . provides a mechanism for enforcing individual rights 'secured' elsewhere, i.e., rights independently 'secured by the Constitution and laws' of the United States." *Gonzaga Univ. v. Doe*, 536 U. S. 273, 285 (122 SCt 2268, 153 LE2d 309) (2002) (citation, punctuation and emphasis omitted). The Contract Clauses of both the Georgia and the United States Constitutions secure individual rights in that they forbid the legislature from enacting any "[l]aw impairing the [o]bligation of [c]ontracts." U.S. Const. Art. I, Sec. 10, cl. 1. See also Ga. Const. Art. I, Sec. I, Par.

---

[21] That Code section provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

36

X (1983). "As such, the [Contract] Clause is aimed at the legislative power of the state and is directed against legislative action only." *Taylor v. City of Gadsden*, 767 F3d 1124, 1132 (III) (A) (11th Cir. 2014) (citations and punctuation omitted). Accordingly, where a state legislative action is not at play, there can be no violation of the Contracts Clause. See id.; see generally *New Orleans Waterworks Co. v. Louisiana Sugar-Ref. Co.*, 125 U. S. 18, 30 (8 SCt 741, 31 LE 607) (1888) ("In order to come within the provision of the constitution of the United States which declares that no state shall pass any law impairing the obligation of contracts, not only must the obligation of a contract have been impaired, but it must have been impaired by a law of the state. The prohibition is aimed at the legislative power of the state, and not at the decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals.").

Silver Comet argues (1) that the home rule provision of the Constitution of Georgia bestows on the governing authority of each county the "legislative power to adopt clearly reasonable ordinances, *resolutions*, or regulations," see Ga. Const. Art. IX, § 2, ¶ I (emphasis supplied); (2) that a Georgia statute provides that counties must codify all "ordinances and resolutions . . . having the *force and effect of law*, see OCGA § 36-80-19 (b) (1) (emphasis supplied); and (3) that the Paulding County

37

Code specifically includes all resolutions passed by the Paulding County Board of Commissioners (BOC). Silver Comet concludes that this syllogism dictates the conclusion that any resolution passed by the BOC, such as Resolution 15-01, is a legislative act subject to the strictures of the Contract Clause of the federal and Georgia Constitutions.

The flaw in this logic is that nomenclature does not control the result. Rather, an action that does not "look[] to the future, and change[] existing conditions by making a new rule to be applied thereafter to all or some part of those subject to [the enacting body's] power" is not a legislative action. *Ross v. Oregon*, 227 U.S. 150, 163 (33 SCt 220, 57 LE 458) (1913) (citation and punctuation omitted). Similarly, whether an act is to be considered legislative, "depends not upon the character of the body [taking the action], but upon the character of the proceedings." *Prentis v. Atl. Coast Line Co.*, 211 U.S. 210, 226 (29 SCt 67, 53 LE 150) (1908), cited in *Ross v. Oregon*, 227 U.S. at 163.

Here, Silver Comet contends that it entered into certain contracts based on the county's action in filing a Part 139 application to apply for a commercial certificate for the airport and that its contracts were impaired when the county passed Resolution 15-01 to withdraw that application. Notably, the Part 139 application has never been

granted. Under these circumstances, Resolution 15-01 — withdrawing the pending Part 139 application — is not a legislative act for the purpose of the Contracts Clause. It can hardly be said that withdrawing a pending application makes a new rule to be applied thereafter to the county's citizens. We therefore find no element of state legislative action by the county passing Resolution 15-01, and thus, there can be no violation of the Contracts Clause. Id. Accordingly, the trial court did not err in dismissing Silver Comet's counterclaim based on the Contracts Clause of the federal and Georgia constitutions. *Taylor*, 767 F3d at 1132-1133 (III) (A).

*Judgment affirmed in Case No. A17A0849; judgment affirmed in part and reversed in part in Case No. A17A0877; judgment reversed in Case No. A17A1273; judgment affirmed in Case No. A17A1274. McFadden, P. J., and Bethel, J., concur.*